# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 20, 2006      Decided January 23, 2007

No. 06-1071

FOG CUTTER CAPITAL GROUP INC.,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of the
Securities and Exchange Commission

*Meredith Moss* argued the cause for petitioner. With her on the briefs were *Lanny J. Davis* and *James A. Meyers*.

*Dominick V. Freda*, Senior Counsel, Securities & Exchange Commission, argued the cause for respondent. With him on the brief were *Brian G. Cartwright*, General Counsel, *Andrew N. Vollmer*, Deputy General Counsel, *Jacob H. Stillman*, Solicitor, and *Randall W. Quinn*, Assistant General Counsel. *Eric Summergrad*, Deputy Solicitor, entered an appearance.

Before: GINSBURG, *Chief Judge*, and RANDOLPH and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*:  The National Association of Securities Dealers (NASD) delisted Fog Cutter Capital Group's public stock from Nasdaq.  The Securities and Exchange Commission dismissed Fog Cutter's petition for review.  *In re Fog Cutter Capital Group, Inc.*, Exchange Act Release No. 34-5,2993, 2005 WL 3500274, at \*4 (Dec. 21, 2005).  The issue in this petition for judicial review is whether the Commission's dismissal was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

The NASD is a registered "national securities association" under the Securities Exchange Act of 1934, 15 U.S.C. § 78o-3(b).  At all times relevant to this case, the NASD operated Nasdaq, an electronic securities exchange.  As a self-regulatory organization, the NASD must maintain rules to protect investors and the public interest.  15 U.S.C. § 78o-3(b)(6).  One of these rules, approved by the Commission, stated that the NASD "will exercise broad discretionary authority over the initial and continued inclusion of securities in Nasdaq in order to maintain the quality and public confidence in its market."  *See* NASD Marketplace Rule 4300.  To that end, the NASD will delist securities if, in its "opinion," events occur that render it "inadvisable or unwarranted" to continue listing the securities "even though the securities meet all enumerated criteria for" listing.  *Id.*

For Fog Cutter, the disqualifying events centered on the criminal investigation, indictment, and conviction of its Chief Executive Officer and Board Chairman, Andrew Wiederhorn, and the manner in which the company dealt with this development. Wiederhorn founded Fog Cutter in 1997 and, with family members, controlled approximately fifty-three percent of the company's stock.  The company operated a national restaurant chain and engaged in banking, financing, and real estate investment activities.

In March 2001, federal prosecutors informed Wiederhorn and Lawrence Mendelsohn, a former president of Fog Cutter, that they were targets of a grand jury investigation into the collapse of Capital Consultants, LLC, an investment adviser for union pension plans. Other than the fact that Wiederhorn and Mendelsohn were investigated for actions unrelated to Fog Cutter, the details of the criminal case are unnecessary to recount. Mendelsohn pleaded guilty and agreed to cooperate with the government. Wiederhorn later entered into a plea agreement and pleaded guilty to a two-count indictment charging him with giving an illegal gratuity and filing a false tax return, both felonies. The district court sentenced him to eighteen months in prison and ordered him to pay a $25,000 fine and $2 million to the Capital Consultants receiver.

On June 2, 2004, the day before Wiederhorn entered into the plea deal, he finalized a leave-of-absence agreement with Fog Cutter. The agreement acknowledged Wiederhorn's plea agreement and imminent incarceration, and provided that during his absence he would retain his titles and responsibilities. Fog Cutter agreed to pay Wiederhorn his $350,000 annual salary, bonuses, and other benefits while he was imprisoned. The company also agreed to pay him a $2 million "leave of absence payment" to retain his "good will, cooperation and continuing assistance, and in recognition of Wiederhorn's past service to the Company, to help avoid litigation and for . . . other reasons." Fog Cutter knew Wiederhorn would use the $2 million payment to pay the restitution his plea agreement ordered. In its filings with the Commission, Fog Cutter disclosed this information and the $4.75 million cost of its agreement with Wiederhorn.

In July 2004, NASD staff decided that it was contrary to the public interest for Fog Cutter to remain listed on Nasdaq with Wiederhorn exercising substantial influence over the company

while incarcerated. *See In re Fog Cutter*, 2005 WL 3500274, at *3. An NASD Panel determined that the Board's willingness to amend Wiederhorn's employment agreement, acquiescence to Wiederhorn's demands for financial support during his imprisonment, payment of his court-ordered restitution, and retention of him in his executive and director positions during his imprisonment were contrary to the public interest. The NASD Listing and Hearing Review Council affirmed the Panel's decision "in order to protect the quality of and public confidence in The Nasdaq Stock Market, and to protect investors and the public interest." *See id*. Fog Cutter applied to the Securities and Exchange Commission for review of the Council's decision. The Commission dismissed the application for review, focusing, as had NASD, on Wiederhorn's status as a convicted felon and the Board's actions supporting and retaining Wiederhorn on the Board and in management.

Fog Cutter's main complaint is that the Commission failed to take into account the company's sound business reasons for acting as it did. The decision to enter into the leave-of-absence agreement was, Fog Cutter argues, in the best interest of its shareholders. The company tells us that Wiederhorn's continuing commitment to the company and his return to an active role in the company after his incarceration were essential to preserving Fog Cutter's core business units.

The company focuses on its 2002 purchase of a majority interest in George Elkins Mortgage Banking Co., Inc. (GEMB). The Stock Purchase Agreement conditioned Fog Cutter's majority interest in GEMB upon Wiederhorn's serving as either a member of the Board or as CEO of Fog Cutter. If he occupied neither position, the minority shareholders had an option to repurchase their interest in GEMB, unless Wiederhorn's absence was due to his death or disability. Fog Cutter claims such a

repurchase would be at "fire sale" prices, and that keeping Wiederhorn on board was therefore essential.

The company has presented nothing to support the likelihood that the options would be exercised. Nor has the company ever specified how much it would have lost from the exercise of the options. All we have is Fog Cutter's obscure assertion, without any citation to the record, that GEMB was "potentially valued at up to $10 million." *See* Opening Br. of Pet'r 22. Even if we put aside the "potentially," we are still left with no information about the difference between the option price and the fair market value – or potential value – of Fog Cutter's GEMB stock. What we do know is that Fog Cutter made a deal with Wiederhorn that cost the company $4.75 million in a year in which it reported a $3.93 million net loss. We know as well that Fog Cutter handed Wiederhorn a $2 million bonus right before he went off to prison, a bonus stemming directly from the consequences of Wiederhorn's criminal activity.

Under Section 19(f) of the Exchange Act, 15 U.S.C. § 78s(f), the Commission must dismiss an application for review of an NASD delisting order if (1) the "specific grounds" "exist in fact," (2) the decision was in accordance with NASD rules, (3) the rules are and were applied in a manner consistent with the Exchange Act, and (4) the decision imposes no unnecessary or inappropriate burden on competition under the Act. Whether the Commission acted arbitrarily, capriciously, or unlawfully depends on whether its review of the NASD's decision complied with Section 19(f).

Here there was ample evidence supporting the NASD's grounds for taking action against Fog Cutter: Wiederhorn's guilty plea, the leave of absence deal and its cost to the company, the Board's determination that Wiederhorn should

retain his positions with Fog Cutter, and the concern that Wiederhorn would continue to exert influence on company affairs even while he was in prison. The decision was in accordance with NASD rules giving the organization broad discretion to determine whether the public interest requires delisting securities in light of events at a company. That rule is obviously consistent with the Exchange Act, and NASD's decision did not burden competition.

Fog Cutter claims that it had to pay Wiederhorn and retain him because if it fired him in light of his guilty plea, it would have owed him $6 million. This scarcely speaks well for the company's case. The potential obligation is a result of an amendment the Board granted Wiederhorn in 2003 while he was under investigation. Wiederhorn's employment agreement stated that if terminated "for cause," he was entitled only to his base salary through the date of termination and payment of unreimbursed business expenses. If it terminated Wiederhorn without cause, Fog Cutter would have owed him three times his annual salary, three times his largest annual bonus from the last three years, unreimbursed business expenses, and accrued but unpaid base salary and bonuses – which Fog Cutter estimates would amount to $6 million – all as a lump-sum payment within ten days. Before the amendment to Wiederhorn's employment agreement in 2003, termination "for cause" included the conviction of *any* felony other than a traffic offense. In the 2003 amendment, the relevant provision allowed the Board to terminate Wiederhorn "for cause" upon conviction of a felony *involving Fog Cutter*. The Board had known about the investigation of Wiederhorn in connection with Capital Consultants for more than two years when it agreed to this amendment.

Fog Cutter thinks NASD's action was "unfair." But it was the company that bowed to Wiederhorn's demand for an

amendment to his employment agreement, knowing full well that it was dramatically increasing the cost of firing him. Now it argues that terminating Wiederhorn would have been too expensive. One is reminded of the old saw about the child who murders his parents and then asks for mercy because he is an orphan. The makeup of Fog Cutter's Board was virtually unchanged between the time it amended the employment agreement and entered into the leave-of-absence agreement. *In re Fog Cutter*, 2005 WL 3500274, at \*2 n.6. It was, to say the least, not arbitrary or capricious for the Commission to find that Wiederhorn exercised thorough control over the Board, and to find this troubling. We agree that the Board provided little or no check on Wiederhorn's conduct, and that the Board's actions only aggravated the concerns Wiederhorn's conviction and imprisonment raised.

That Fog Cutter did not itself violate the securities laws and that it disclosed the relevant events does not demonstrate any error in the delisting decision. The NASD's rules state that it may apply criteria more stringent than the minimum standards for listing. *See* NASD Marketplace Rule 4300. Fog Cutter's disclosure of its arrangements with Wiederhorn did not change the nature of those arrangements, which is what led the NASD to find that the company's actions were contrary to the public interest and a threat to public confidence in the Nasdaq exchange.

Fog Cutter points to the continued listing of two companies – Steve Madden and Martha Stewart Living Omnimedia – in spite of the fact that Steve Madden and Martha Stewart, the chief executives of the companies, were convicted and imprisoned. This amounts to a selective prosecution argument, and it goes nowhere. To prove selective prosecution, a claimant must be part of a protected class under the Equal Protection Clause, U.S. CONST. amend. XIV, § 1, and show not only that

prosecutors acted with bad intent, but also that "similarly situated individuals [outside the protected category] were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Fog Cutter clearly cannot prove all, if any, of these factors. As the Commission points out, Martha Stewart Living Omnimedia is listed on the New York Stock Exchange, not Nasdaq. And it is the NASD, not the Commission, that institutes the delisting investigations and renders delisting decisions. The Commission's role is as a reviewing body, not an initiator.

In delisting Fog Cutter, the NASD was concerned with the integrity and the public's perception of the Nasdaq exchange in light of both Wiederhorn's legal troubles and the Board's ongoing acquiescence to his demands. The Commission amply supported these concerns and was well within its authority to dismiss Fog Cutter's application for review of the NASD's delisting decision. We therefore deny Fog Cutter's petition for judicial review.

*So ordered.*